**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **ALEX PEPRAH,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| **v.** | * | **Civil Case No. SAG-18-990** |
| | * | |
| **CPL. G. WILLIAMS,** *et al.*, | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

On April 5, 2018, Plaintiff Alex Peprah ("Peprah") filed a 42 U.S.C. § 1983 action against Howard County police officers Cpl. G. Williams, PFC Lux, DFC Gregory, D/CPL Zammillo, and an unnamed officer called "John Doe" (collectively "the officers"), individually and in their official capacity, and against Howard County (collectively "Defendants"). ECF 1. Peprah alleged the officers violated his constitutional rights under the Fourteenth Amendment Due Process Clause, the Fourth Amendment, and the Fourteenth Amendment Equal Protection Clause. *Id.* Peprah also alleged Howard County was liable for the constitutional violations of the officers under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Id.* Upon appropriate motion by Defendants, the Court dismissed the Fourteenth Amendment and corresponding *Monell* counts of the complaint for failure to state a claim. ECF 23. On July 28, 2020, Defendants filed a Motion for Summary Judgment on the remaining Fourth Amendment and corresponding *Monell* claims. ECF 47. Peprah filed a response in opposition, ECF 52, and Defendants replied, ECF 54. A hearing is not necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

## I.     FACTUAL BACKGROUND

This case arises out of the investigatory stop and subsequent detention of Peprah by the Howard County police on June 3, 2015.  Peprah's interaction with police was precipitated by an armed robbery at a Verizon Wireless retailer in Ellicott City, Maryland.  ECF 47-3 at 15-16.  The robber brandished a handgun at store employees, ordered one employee to place a number of cell phones into a duffle bag, and left with the stolen merchandise.  *Id.*  Unbeknownst to the robber, the store employee also put a GPS tracking device in the duffle bag.  *Id.*  The victims initially described the robber as a "skinny" Black male.  *Id.* at 16:6-13.  Additional witness descriptions indicated the robber dressed in all black, wore a hat and a mask, and appeared approximately six-feet tall.  ECF 52-6 at 1.

Reports of the robbery and the fleeing suspect's movements were broadcast to Howard County police operating in the vicinity of the Verizon store.  ECF 47-7 at 21.  A Verizon security manager communicated the real-time location of the stolen GPS tracker to 911 personnel, who relayed the information to police.  ECF 47-5 at 6.  Based on the speed the tracker was moving, police believed it to be in a vehicle.  *See id.* at 4 (reporting the tracker moving at thirty-one mph). The tracker was initially reported to be in a Giant store parking lot.  *Id.* at 7.  Next, the tracker moved south to Old Annapolis Road, and then to Phelps Luck Drive.  *Id.* at 8.  Eventually, the security manager reported the tracker to be stationary near the 5300 block of Phelps Luck Drive. *Id.*

Peprah is a fifty-five-year-old resident of Laurel, Maryland, who immigrated from Ghana approximately twenty years ago, and is now a U.S. citizen.  ECF 52-1 at 5-6.  Peprah has been a professional driver for several years, driving for Uber since around 2014.  *Id.* at 10:14-11:7.  Police reports describe Peprah as "approximately 5'7" and 200 lbs."  ECF 52-6 at 2.  On June 3, 2015,

Peprah was working for Uber, driving a customer home from work. ECF 52-1 at 22-31. After completing the trip, Peprah proceeded home, driving along Phelps Luck Drive, when he noticed three police cars following behind him. *Id.* at 39-44. Within minutes, the police activated their lights and sirens, and pulled Peprah over on the side of the road. *Id.* at 44.

CPL Williams was the officer who first spotted and began following Peprah's car. ECF 47-7 at 21:13-22:15. Williams was working in plainclothes, on a separate surveillance mission in the area, when he heard reports of the armed robbery. *Id.* He drove to Phelps Luck Drive, the last reported location of the tracker. *Id.* Within minutes, he arrived and observed that the only occupied vehicle was Peprah's car. *Id.* Williams requested uniformed officers to his location, and soon after initiated the stop of Peprah's vehicle. *Id.*

Peprah had no idea why he was being pulled over, but he complied with commands from the officers to roll down his window and show his hands. ECF 52-1 at 46:8-49:4. A number of officers approached Peprah's vehicle with their service weapons drawn. *Id.* at 49:15-50:22. Two officers, one in uniform and one in plainclothes (later identified as PFC Lux), approached the driver's side, opened Peprah's door, and removed him from the vehicle. *Id.* at 58:12-70:5; ECF 47-4 at 34-35. The officers made Peprah lie face down on the pavement, handcuffed him, and patted him down. ECF 47-4 at 35; ECF 52-1 at 90-91. The officers then placed Peprah in the back of a police cruiser. ECF 47-4 at 35:14-19. Peprah claims that during this encounter, one officer struck him in the back, and PFC Lux ground his knee into Peprah's lower back while he was on the ground. ECF 52-1 at 85:1-86:4, 88:11-15, 94:13-16. Peprah also claims the officers never explained why he was being treated with such force. ECF 52-1 at 96: 1-6, 103: 11-13.

While Peprah remained handcuffed in the back of the police cruiser, the officers continued their investigation. Eventually, they found the GPS tracker in a lightly wooded area off Phelps

Luck Drive.  ECF 47-9 at 1; ECF 47-12 at 26:14-27:14.  The police brought one of the robbery victims to the scene for a one-on-one identification.  ECF 47-9 at 1.  The witness, however, affirmatively stated that Peprah did not look like the robber.  *Id.*; ECF 47-6 at 110:4-18.  About an hour after Peprah had initially been detained, police removed the handcuffs.  ECF 52-1 at 117:13-22; ECF 47-1 at 8.

CPL Zammillo and DFC Gregory, detectives from the robbery unit, told Peprah he was not under arrest or being charged with a crime, but asked if he would answer some questions.  ECF 52-1 at 117:13-119:20, 121:1-122:2.  Zammillo gave Peprah *Miranda* warnings and recorded the conversation.  *Id.* at 122:6-21; ECF 47-12.  Peprah, who was still sitting in the back of the police car, talked with the officers for approximately forty-five minutes.  ECF 47-1 at 8.  He explained how he had been driving for Uber, and allowed the officers to look at the Uber app on his iPhone, which contained his trip history.  ECF 47-12 at 11-15.  The trip history confirmed that Peprah was not at the Verizon store that day.  ECF 47-6 at 46:1-4.  The officers concluded the interview and explained to Peprah that it appeared that he was simply in the wrong place at the wrong time.  ECF 52-1 at 151:7-13.  Peprah eventually drove himself home.  His entire interaction with the police lasted approximately one hour and forty-five minutes.

Peprah was shaken by the ordeal.  ECF 52-1 at 153: 2-14.  A few weeks later he filed a complaint with the Howard County Police Department, which conducted an internal investigation.  ECF 47-13; ECF 47-11.  Peprah maintains that he has "suffered permanent, serious physical injuries" due to the incident and "still experiences pain in his lower back" to this day.  ECF 52 at 2.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, as the moving party, bear the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011). If Defendants establish that there is no evidence to support Plaintiff's case, the burden then shifts to Plaintiff to proffer specific facts to show a genuine issue exists for trial. *Id.* Plaintiff must provide enough admissible evidence to "carry the burden of proof at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).

The mere existence of a scintilla of evidence in support of Plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Casey*, 823 F. Supp. 2d at 349. Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. Plaintiff "must produce competent evidence on each element of his or her claim." *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). If Plaintiff fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also Casey*, 823 F. Supp. 2d at 348-49. In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most

favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

## III.   ANALYSIS

Peprah argues that the officers violated his Fourth Amendment right to be free from unreasonable seizures because (1) he was detained without proper justification and (2) the officers used excessive force against him.  ECF 1, ¶¶ 84-100.  Defendants contend that neither of these violations occurred and, even if they did, the officers are entitled to qualified immunity because any right that was potentially violated was not clearly established.  ECF 47-1 at 1.

Qualified immunity seeks to balance the need to hold irresponsible public officials accountable with the need to protect government officials who "perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  Because qualified immunity is "an immunity from suit rather than a mere defense to liability," the Supreme Court has explained that the defense should be considered "at the earliest possible stage in litigation." *Id.* (first quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985); and then quoting *Hunger v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).  Qualified immunity is properly invoked where an officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam).  "Clearly established" should not be "defined 'at a high level of generality.'" *Id.* at 551-52 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Although a previous case need not be "'directly on point' for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* at 551 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam)).

### A.  The Investigatory Detention

Peprah argues that both the initial stop of his vehicle and the one hour and forty-five minute investigation that followed were unreasonable.  The police detention of a vehicle and its passenger "even for a limited time and purpose, constitutes a Fourth Amendment seizure," the legality of which is analyzed using the two-pronged approach described in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Beeson*, 611 Fed. Appx. 773, 774 (4th Cir. 2015) (per curiam) (citing *Whren v. United States*, 517 U.S. 806, 809-10 (1996)).  Under this doctrine, "the police officer's decision to stop the vehicle must be both 'justified at its inception' and sufficiently 'limited both in scope and duration.'"  *Beeson*, 611 Fed. App'x at 774 (quoting *United States v. Digiovanni*, 650 F.3d 498, 506-07 (4th Cir. 2011)).  Even though "the right not to be stopped 'absent . . . reasonable suspicion' and the right not to be detained longer than necessary are clearly established," in considering qualified immunity, the Court must consider "whether the violative nature of *particular* conduct is clearly established."  *Hicks v. Ferreyra*, 396 F. Supp. 3d 564, 577 (D. Md. 2019) (first quoting *Artiga Carrero v. Farrelly*, 270 F. Supp. 3d 851, 872 (D. Md. 2017); and then quoting *Ziglar v. Abbasi*, 137 S. Ct. 305, 308 (2015)), *aff'd in part, appeal dismissed in part*, 965 F.3d 302 (4th Cir. 2020).

### 1.  Initial Seizure

To conduct an investigatory stop, police officers must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Navarette v. California*, 572 U.S. 393, 396-97 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)).  The "reasonable suspicion" required is based on a "totality of the circumstances," and depends both upon the "content" and the "degree of reliability" of the information known to the officer making the stop. *Id.* (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)).  The officer must have more

than a "hunch," but reasonable suspicion "requires . . . considerably less than proof of wrongdoing by a preponderance of the evidence." *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020) (quoting *Navarette*, 572 U.S. at 397). Some factors that are "individually innocent" may contribute to a finding of reasonable suspicion if the government can articulate "concrete reasons for such an interpretation." *United States v. Bowman*, 334 F.3d 200, 219 (4th Cir. 2018).

In *United States v. Lender*, the Fourth Circuit explained that "an area's propensity toward criminal activity is something that an officer may consider" in evaluating reasonable suspicion, however, "mere presence in a high crime area is not by itself enough to raise reasonable suspicion." 985 F.2d 151, 154 (4th Cir. 1993). In *Lender*, police stopped a man observed in an area known for illegal drug sales in the middle of the night after they saw a group of men gather around the suspect and "look[] down into his open palm." *Id.* The officers suspected that they had witnessed an illegal drug transaction, although they also "acknowledged that from their passing patrol car they could not see drugs or other contraband." *Id.* Under these circumstances, the court implored the police were not resigned to "shrug [their] shoulders and allow a crime to occur." *Id.* (alteration in original) (quoting *Adams v. Williams*, 407 U.S. 143, 145 (1972)). The suspect's presence in a known drug-trafficking area at the late hour and his interaction with the other men was enough to create reasonable suspicion that would prompt officers "to investigate further." *Id.*

Even where a violent crime is suspected in the area, though, reasonable suspicion requires police to articulate reasons particular to the person seized. In *United States v. Curry*, the court held that an officer did not have reasonable suspicion to stop a man walking away from a building where gunshots were heard minutes before. No. 3:17cr130, 2018 WL 1384298 at *10-12 (E.D.

Va. Mar. 19, 2018), *aff'd en banc*, 965 F.3d 313 (4th Cir. 2020).[1]  In *Curry*, there were several individuals walking in different directions near the building, and though police had heard gunshots, they had no other information about what crime may have been committed or a description of anyone who had been involved. *Id.* at *1-2.  The officers relied solely on the gunshots, and the knowledge that there were recent violent incidents in the area, to stop the defendant. *Id.* at *10-11.  Because they had articulated no other facts specific to the defendant, the district court found the officers did not have reasonable suspicion necessary to justify the seizure. *Id.*

Here, there is no material dispute regarding the facts and circumstances considered by CPL Williams prior to stopping Peprah's vehicle.  Williams was informed in a radio call that a Black male had committed an armed robbery, that stolen goods were taken along with a GPS tracker, and that the tracker's location was being communicated to dispatch personnel.  ECF 47-7 at 21:6-12, 26:11-16.  Williams also knew that the GPS device was likely in a vehicle because of the speed and pattern of the signal, although Williams stated in his deposition that he did not know the particular type of vehicle.  ECF 47-7 at 26:17-20.  Upon arriving at Phelps Luck Drive, the most recent reported location of the GPS tracker, Williams spotted Peprah's vehicle.  Williams thought it was suspicious because it was the only occupied, running vehicle in the vicinity of the GPS tracker's reported location, which Williams believed had been relayed "supposedly without delay."  ECF 47-7 at 32:15-20.  Williams also noted that the vehicle stood out because it was parked between two houses: "He wasn't in front of either one, like if you were dropping someone off or picking someone up or delivering food." *Id.* at 36: 16-20.  Although Peprah is a Black male, like

---

[1] The Fourth Circuit affirmed the suppression of evidence found after an illegal seizure of the *Curry* defendant, based on finding that there were no exigent circumstances that justified the stop. On appeal, the government abandoned the argument that officers had reasonable suspicion to seize the defendant, and the case proceeded only on the question of whether exigent circumstances justified the stop.

the reported description of the suspect, Williams testified that he "can't honestly say whether" he could identify Peprah's race before pulling him over. *Id.* at 94:5-16. Williams believed the rest of the surrounding circumstances raised his suspicion sufficiently to initiate the stop. ECF 47-7 at 93:13-94:16 (explaining "that was the only occupied vehicle [he] had at the location dispatch was telling [him] the box was pinging from" and that he would have stopped the car regardless of who was in the driver's seat).

The particular area of Phelps Luck Drive where Peprah was detained on the night in question was not merely an area where criminals were previously apprehended, or where future criminal activity was suspected to occur. *See Lender*, 985 F.2d at 154 (stating an area's propensity towards criminal activity could be considered in evaluating reasonable suspicion). It was the precise reported location of the fruits of a violent crime, which were believed to be in a vehicle based upon their recent real-time movement. Furthermore, unlike in *Curry*, where there were a number of people walking in an area where gunshots had been heard and police officers had no articulable reason for stopping any particular individual, here, Peprah's vehicle was the only occupied vehicle observed in the vicinity. Williams also noted that Peprah's car seemed to fit the pattern of the suspect vehicle, because it was facing the direction the suspect vehicle was reported to have been traveling before stopping, and did not appear to be stopped for any legitimate reason. Like the officers in *Lender*, here, Williams could not confirm Peprah was engaged in criminal activity based on his personal observations alone. However, Peprah's positioning matched the known information regarding the vehicle believed to conceal the tracking device. Thus, it was arguably reasonable for Williams and the other officers to "investigate further." *Lender*, 985 F.2d at 154.

However, determining whether the undisputed facts amounted to reasonable suspicion is not necessary, because even if Williams erred on the wrong side of the line, he did not violate a "clearly established" right. *Pearson*, 555 U.S. at 236 (explaining that a court is not required to determine whether a right has been violated before finding the right was not clearly established). Assuming arguendo that Williams lacked reasonable suspicion to initiate the stop, it would represent merely a "bad guess[] in a gray area[]" and not a "bright line[]" violation of the law. *See Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Marciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The court has not found, and Peprah has not presented, any analogous case that would clearly indicate that under these circumstances, Williams was violating Peprah's Fourth Amendment rights by initiating an investigatory stop.[2] Summary judgment for Defendants will be granted as to Peprah's claims arising from the validity of the initial seizure.

## 2. Prolonged Investigation

The next issue is whether the remainder of Peprah's detention was justified. A seizure that is lawful in its inception may "become unlawful if it is prolonged beyond the time required to complete [the] mission." *Bowman*, 884 F.3d at 209 (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). A prolonged stop remains lawful where "the police diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). Although an investigative stop "obviously" cannot "continue[] indefinitely," the Supreme Court has declined to apply rigid timetables to

---

[2] Peprah does not argue that the doctrine of qualified immunity is inapplicable, but asks the court not to consider the officers' qualified immunity defense, because Defendants dedicated a limited amount of briefing to the doctrine in their Motion for Summary Judgment. ECF 50 at 22. Defendants, however, have repeatedly asserted the qualified immunity defense since their Answer to the Complaint. *See* ECF 17 at 7. The question of whether the Defendants are entitled to qualified immunity is thus properly before the court.

distinguish when a stop becomes an arrest. *See id.* (explaining that a "*per se* rule that a 20-minute detention is too long to be justified under the *Terry* doctrine" is "clearly and fundamentally at odds" with the Court's precedent); *see also Schloss v. Lewis*, No. JFM-15-1938, 2016 WL 1451246 (D. Md. Apr. 12, 2016) (finding a 75-minute detention was justified by reasonable suspicion).

Still, though not dispositive, "[t]he duration or brevity of the stop is a key consideration in determining its intrusiveness," *United States v. Alpert*, 816 F.2d 958, 961 (4th Cir. 1987), and investigative detentions that exceed a "brief encounter" warrant particular scrutiny. *See United States v. Place*, 462 U.S. 696, 709-10 (1983) (finding the length of a ninety-minute detention "alone precludes the conclusion that the seizure was reasonable"). But the analysis should focus on "common sense and ordinary human experience . . . over rigid criteria." *Sharpe*, 470 U.S. at 685; *see also United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (describing the evaluation of a *Terry* stop as a "highly fact-specific inquir[y]"). Particularly, where "police are acting in a swiftly developing situation . . . the court should not indulge in unrealistic second-guessing." *Id.* at 687. This does not, however, give unreviewable discretion to police. Clearly, when, "after some investigation," an officer realizes "that no criminal activity [is] happening at the scene," continuing to detain a person "is a violation of the individual's Fourth Amendment rights." *Hicks*, 396 F. Supp. 3d at 579 (holding officers were not entitled to qualified immunity after detaining a driver for fifteen minutes after all reasonable suspicion had dissipated).

The length of the detention, however, is not the end of the inquiry. "[T]he quality or nature of a detention may also exceed the limits of a *Terry* stop." *United States v. Manbeck*, 744 F.2d 360, 376, n.22 (4th Cir. 1984). Even where an officer is engaged in an otherwise diligent investigation, a detention may still violate the Fourth Amendment absent probable cause where police "seek to verify their suspicions by means that approach the conditions of arrest." *Florida*

*v. Royer*, 460 U.S. 491, 499, 503 (1983) (holding an encounter that began with reasonable suspicion became an arrest when two law enforcement officers took the suspect from an airport terminal to a small police room).  The precise "scope of intrusion permitted will vary" with the particular facts of each case.  *Id.* at 500.  Indeed, the Fourth Circuit has held that some circumstances may warrant intrusive measures often associated with arrest, such as "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force," without automatically exceeding *Terry*'s limitations.  *United States v. Leshuk*, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (citing cases).  However, such measures are only permissible where justified by a "legitimate safety concern."  *See United States v. Avagyan*, 164 F. Supp. 3d 864, 896 (E.D. Va. 2016) (finding police were not permitted to transport a suspect across a shopping center in handcuffs without both reasonable suspicion and a safety concern or probable cause); *see also Royer*, 460 U.S. at 504 (explaining that, though ordinarily "moving a suspect from one location to another" is not within the bounds of an investigatory detention, doing so may be justified without probable cause for "safety and security" reasons).

Placing a suspect in a patrol car during a *Terry* stop is "problematic" because of its "inherently coercive aspects."  *United States v. Manbek*, 744 F.2d 360, 377 (4th Cir. 1984).  However, it may be acceptable when there is "no feasible alternative."  *Id.*  In *Manbek*, Police stopped a truck driver based on reasonable suspicion that he was transporting illegal drugs and asked the driver to step out of his truck in case there were weapons in the vehicle.  *Id.* at 367, 377.  Because it was cold and rainy, the officers placed the driver in "the only available shelter—a police car" and told him to keep his hands visible while they ran a license check.  *Id.*  The court held that these actions were permitted under *Terry* because they were "unavoidable" and "the least intrusive means to effectuate the investigative stop."  *Id.*  Indeed, the court noted that asking the suspect to

keep his hands on the front seat of the patrol car "was less intrusive than a frisk, which, under *Terry*, the officers were fully entitled to do." *Id.*

Similarly, handcuffing does not automatically transform a *Terry* stop into an arrest when "reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop." *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir. 1989) (alteration in original) (quoting *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988)). For instance, where there are multiple suspects or police have reason to believe a suspect might attempt to flee, it may be reasonable for an officer to use handcuffs during the investigative stop. *Id.* (finding handcuffing permissible where the officer could "reasonably anticipate that he might be required to go to the aid of his fellow officers"); *United States v. Ruffin*, 814 Fed. App'x 741, 749 (4th Cir. 2020) (finding handcuffing reasonable where officers believed suspect was "preparing to flea" and completing the investigatory stop without handcuffing would be "an incredibly dangerous maneuver"); *see also United States v. Bautista*, 648 F.2d 1286, 1289 (9th Cir. 1982) (finding handcuffing reasonable during a *Terry* stop where one officer was left with two men suspected of fleeing a bank robbery, but stating that once a second officer arrived it "present[ed] a much closer question").

Where safety concerns are absent, though, measures like handcuffing, or forcing a suspect into a police car, are no longer "the least intrusive means reasonably available" to conduct the investigation. *Royer*, 460 U.S. at 500. Indeed, they transform the stop into an arrest that requires probable cause. *See Avagyan*, 164 F. Supp. 3d at 896 (holding a suspect was arrested when "deputies handcuffed [him] and placed him in a squad car").

Peprah's detention was intrusive both in its scope and duration. Peprah was pulled out of his vehicle at gun point, forced to lie face down on the pavement, handcuffed, patted down, and

14

locked in the back of a police car with his hands restrained behind his back for approximately one hour. ECF 47-4 at 35:14-19, 18:18-20, 64:18-20. These measures were intrusive hallmarks of arrest, unjustified by any safety or security concern. Because the officers suspected Peprah of committing an armed robbery involving a handgun, it may have been reasonable for police to approach Peprah's vehicle with their weapons drawn, force him out of his vehicle, and pat him down for weapons. However, once they discovered Peprah had no weapons on him or in his vehicle, there was no longer a legitimate articulable safety concern. By their own testimony, Peprah was extremely compliant with the officers' commands and did not even "mak[e] too many comments." *E.g.*, ECF 47-4 at 33:19, 35:11-19 (testifying Peprah was "compliant . . . the whole time"). Furthermore, there were at least four officers on the scene, if not more, and at least one dedicated to guarding Peprah the entire time. ECF 52-1, 76:1-16 (describing two officers restraining him and other officers standing by with their guns drawn), 103:5-9, 108:15-22 (describing seeing at least four officers searching his car and one officer standing guard). Unlike other cases where restraining a suspect during a *Terry* stop was reasonably necessary, Peprah posed no threat and did not display the inclination or ability to flee. There were no other circumstances, like inclement weather, that made putting him in the police car "unavoidable." These conditions indicate that Peprah's detention exceeded the bounds of a *Terry* stop.

Additionally, throughout the course of the nearly two-hour interaction, the officers never developed probable cause to arrest Peprah. In fact, the reasonable suspicion of Peprah that may have justified his initial seizure was dissipating as the investigation continued. Even after searching Peprah and his entire vehicle, officers did not find the GPS tracker or anything tying Peprah to the robbery. The witnesses' descriptions did not match Peprah's appearance, and a witness brought to the scene confirmed that Peprah did not resemble the robber. *See* ECF 47-9 at

1 (reporting the witness was "positive that Peprah was not the suspect" and that Peprah had a different body type than the robber). Defendants cursorily assert they developed probable cause after finding the actual GPS tracker off Phelps Luck Drive, near where Peprah's vehicle was first spotted. ECF 47-1 at 17-18. However, the record reflects Peprah had already been locked in the police cruiser for thirty to sixty minutes before police recovered the GPS tracker. *See* ECF 47-11 at 15-16 (stating that Peprah was first handcuffed at approximately 10:00 PM and sometime between 10:30 PM and 11 PM police found the GPS tracker). Admittedly, the officers may still have had a good faith belief that Peprah was somehow involved, perhaps as an unseen accomplice, and were still working to "rule[] him out." *See* ECF 47-6, 44: 7-14, 46:1-4 (explaining that "individuals that commit crimes often have drivers" so the police only concluded he was not involved after seeing his Uber location data). However, "detentions may be 'investigative' yet violative of the Fourth Amendment absent probable cause." *Royer*, 460 U.S. at 499.

Based on the undisputed facts, a reasonable jury could find the scope and duration of Peprah's detention violated his Fourth Amendment rights. The hour-and-forty-five minute duration of the stop alone was significantly intrusive.[3] *See Place*, 462 U.S. at 710 (concluding a ninety-minute detention was "sufficient to render the seizure unreasonable"). The scope of this detention, though, clearly exceeded the bounds of a permissible *Terry* stop. No reasonable officer would believe handcuffing Peprah in the back of a police cruiser for an hour, under these circumstances, was necessary for safety or security reasons, and thus the officers' conduct clearly

---

[3] It is undisputed that Peprah was handcuffed and locked in the police cruiser for approximately one hour. *E.g.*, ECF 47-11 at 15-16; ECF 52 at 7. Officers subsequently removed the handcuffs and conducted an interview of Peprah that lasted an additional forty-five minutes. The officers claim the interview was "voluntar[y]," ECF 47-1 at 7, while Peprah characterizes it as an "interrogation" in which he was not sure whether he was allowed to leave, ECF 52 at 8. However, the dispute is not material, because the stop became an arrest prior to the interview.

constituted an arrest. Furthermore, no reasonable police officer would believe there was probable cause to arrest Peprah based on his relative location to the GPS tracker. The officers' qualified immunity defense, therefore, fails, and the motion for summary judgment for claims arising from the prolonged detention is denied.

### B. Excessive Force

The Fourth Amendment also requires every seizure to be carried out in a reasonable manner. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (explaining that the Fourth Amendment protects against "physically intrusive conduct" during police apprehension). Although "an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *id.* at 396, the Fourth Amendment prohibits police from "using excessive force to seize a free citizen," *Hupp v. Cook*, 931 F.3d 307, 321 (4th Cir. 2019). Whether force is excessive is determined by asking "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Id.* at 321-22. To answer, the court analyzes three factors identified by the Supreme Court in *Graham*: (1) "the severity of the crime at issue," (2) whether there was "an immediate threat to the safety of the officers or others," and (3) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight," as well as "the extent of the plaintiff's injuries." *Id.* at 322 (quoting *Graham*, 490 U.S. at 396).

In this case, the undisputed facts show that the officers seized Peprah because they believed he was involved in an armed robbery committed minutes prior, where the perpetrator pointed a handgun at the victim, stole a number of expensive goods, and fled the scene. ECF 47-3 at 15. The undisputed facts also show that Peprah was unquestionably compliant with the officers' commands and did not resist in any way. ECF 47-4 at 33:19, 35:11-13 ("And he was complaint

with me the whole time. I don't even remember him really making too many comments to me.") Peprah and Defendants, however, present conflicting testimony about how much force was actually used by the officers in removing Peprah from his vehicle, bringing him to the ground, and handcuffing him.

As Defendants point out, a summary judgment motion cannot be defeated by a party's "statements that contradict his own, earlier testimony." *Hicks*, 396 F. Supp. 3d at 573; *see also Barwick v. Celotex Corp.*, 736 F.2d (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). However, the plaintiff may defeat a motion for summary judgment by submitting his own testimony which contradicts that of other witnesses, "as it is for the finder of fact to weigh such testimony and assess the credibility of witnesses." *Hicks*, 396 F. Supp. 3d at 573 (citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002)).

Peprah first filed a complaint alleging police used excessive force against him during the June 3, 2015 incident about one month later, on July 8, 2015. In his sworn affidavit, Peprah stated, "One officer struck me from behind and I fell on my knees." ECF 47-13. On August 3, 2015, in an interview with the Howard County Police Department Internal Affairs Division, Peprah again told the interviewer that "he was struck with something in his lower back area," and that he thought "one of the officers used a knee strike on his back." ECF 47-11. The Internal Affairs Division also noted in their investigation report that Peprah had seen a doctor on June 4, 2015, the day after the incident with police. *Id.* at 15. He was "treated for a sprain to his lumbar region" and prescribed pain medication and physical therapy. *Id.* In his 2019 deposition, Peprah maintained that he was hit in the back before being forced to his knees. ECF 47-8 at 85-86 ("[A]ll of a sudden, I took a huge knock in the—on my—on my left side of my lower back. . . . Somebody struck me.").

Peprah also testified in his deposition that while he was on the ground, an officer "was grinding his knees on my lower back in a punitive manner."  *Id.* at 94:13-16.  Peprah identified the officer as one who was wearing plainclothes.  *Id.*

Defendants argue that Peprah's statements should be discounted because they are "inconsistent" with his initial interview with officers on the scene.  ECF 47-1 at 21-22.  After being handcuffed in the back of a police car for nearly an hour, CPL Zammillo and Detective Gregory interviewed Peprah about what had happened that evening.  *Id.*  Zammillo asked Peprah where he had been driving that evening before he was pulled over.  ECF 47-3 at 21-22.  Peprah described his surprise and confusion when he realized the officers were pulling over his vehicle:

> Then I take off again.  Then I see they take off once again behind me.  And I stopped at the stop light.  You know, stopped with emphasis, because I know it is the police. . . . Then I took up again from the stop light and all of a sudden there's the wow, wow. And oh this one, "hands up", and this one "Both hands up crook", "get out" and then handcuffs.  That was not fun (laugh)."

*Id.* at 22.  Defendants contend that this statement is contradictory to his later statements, because he did not specifically describe being hit in the back and pinned on the ground to the interviewing officers "who played no role in the initial investigative stop."  ECF 47-1 at 21.  However, it would be reasonable for Peprah to leave out those details.  The focus of the discussion with Zammillo was Peprah's activity leading up to his interactions with police.  *See* ECF 47-3 20-25; ECF 52-1 at 141: 11-13 (testifying that from Peprah's perspective the "scope" of the conversation was "the reasons why . . . the police pulled [him] over in the first place).  Zammillo did not ask Peprah any follow-up questions about his interactions with the officers after the stop, and Peprah did not expressly deny having been subjected to physical force.  *See* ECF 47-3 20-25.  Instead, Zammillo immediately returned to questioning Peprah about where he had been driving earlier that day.  *Id.*  Furthermore, it is not clear that Peprah knew whether Zammillo and Gregory had been involved

in the initial stop. *See* ECF 52-1 at 141:5-20 (stating he did not initially describe "the details of how they took [him] out of the car . . . Because right from the beginning, I assumed maybe there was one of them [there] from the beginning. . . . at the time, I didn't [know]"). Therefore, Peprah's deposition testimony is not a contradiction of his prior statement to the officers, and can be properly considered.

PFC Lux was on a plainclothes assignment on the night that Peprah was detained, and by his own testimony was one of the two officers who removed Peprah from his vehicle and put him in handcuffs. ECF 47-4 at 22:18-21, 34:14-35:19. In his deposition, Lux testified that he told Peprah that he "want[ed] him to lie down on the ground when he [came] out of the car" and that Peprah "laid right down." *Id.* at 35: 2-19. Lux also testified that, while Peprah was on the ground, "most likely probably [his] knees" were in contact with Peprah's body, and were probably positioned on Peprah's "thigh" or "ribcage." *Id.* at 49:2-21. The only other person Lux identified as having possibly had physical contact with Peprah was Officer Morrison, who is not a named party in this litigation. The Howard County Internal Affairs Division interviewed Morrison, Williams, and Lux, and none reported that Peprah had been struck by an officer or brought to the ground in an aggressive manner. ECF 47-11 at 6-7 (reporting one officer thought Peprah was "put on the ground very gently" and another stated it was "not a 'hard take down'"). Williams also testified at deposition that he observed Peprah being handcuffed by Lux and another officer, and did not see anyone kneel on Peprah. ECF 47-7 at 72:1-7 ("But nobody knelt on him, stood on him, nothing of those.").

Peprah has presented evidence that he was hit by police and pinned to the ground, although he was undisputedly complying with the officers' commands. Other witnesses contradict Peprah's account of the incident. Peprah's expert witness, Mr. Charles Key, Sr., opined that one version of

events was "not objectively reasonable" and one was "objectively reasonable."  ECF 52-8 at 2-3. However, on summary judgment, the Court does not make credibility determinations or determine whose version of events should be believed.  Looking at the facts in a light most favorable to Peprah, the court concludes that a reasonable jury could find that excessive force was used against Peprah in violation of his Fourth Amendment rights.

However, on the evidence presented, a reasonable jury could not conclude that all of the officers used excessive force.  Indeed, the record is devoid of any indication that any officer besides PFC Lux or Officer Morrison, who is not a named Defendant, had physical contact with Peprah prior to him being placed in the back of the police cruiser.  Other officers were present providing additional security, "covering" the officers interacting with Peprah, or conducting other parts of the investigation.  *E.g.*, ECF 52-1 at 83:11-13, 96:7-20.  But there is simply no evidence that any other officer touched Peprah in any way, and, therefore, the Defendants' motion for summary judgment for claims arising from alleged excessive use of force will be granted as to Williams, Gregory, and Zammillo.

Returning to the excessive force claim against Lux, the court further concludes that qualified immunity cannot extinguish Peprah's claim at this stage.  Viewing the facts as described by Peprah, no reasonable police officer would believe the degree of force used was reasonable. *See Smith v. Ray*, 855 F. Supp. 2d 569, 581 (E.D. Va. 2012) ("The question on summary judgment is whether—after resolving those factual contests in favor of [the plaintiff]—a reasonable officer in [the defendant's] position would have known the force used was excessive."), *aff'd* 781 F.3d 95 (2015).  In evaluating the *Graham* factors, the seriousness of the crime at issue, an armed robbery, weighs in favor of Lux.  *See Smith*, 781 F.3d at 102 (explaining this factor turns on whether the crime indicates the person is a "potentially dangerous individual"); *Parker v. Gerrish*, 547 F.3d 1,

9 (1st. Cir. 2008) (distinguishing driving while intoxicated from "an offense like robbery or assault" that "present a risk of danger to the arresting officer").  However, the other two factors— whether there was an "immediate threat" and whether the suspect attempted to resist or evade police— weigh heavily in Peprah's favor.

According to Peprah, he was struck in the back while he was surrounded by police officers, one who was holding his hands together, while others had their weapons trained on him.  Peprah further testified that Lux ground a knee into his back while Peprah was pinned to the ground with his hands pulled behind him.  Although officers may have suspected Peprah had a handgun on him, he was both outnumbered and incapacitated at that point.  Further, Peprah made no attempt to resist or evade the officers, but was extremely compliant throughout the encounter.  In fact, Lux testified that the use of force was not necessary to detain Peprah:

> Q. Okay.  All right. And whenever he was asked to go to the ground, for instance, you described to be earlier, he laid down?  In other words, he voluntarily went to the ground; no force was necessary to put him on the ground, get his hands behind his back, handcuff him; is that right?
>
> A. That's correct.

ECF 47-4, 51:7-14.  Finally, Peprah suffered a back injury from the incident which he claims still causes him pain years later.  Although this was perhaps not as extensive as the physical injuries in many excessive force claims, "the severity of the injury does not alone determine the proportionality of forced use."  *Smith*, 855 F. Supp. 2d at 582; *see Cowles v. Peterson*, 344 F. Supp. 2d 472, 483-84 (E.D. Va. 2004) (denying qualified immunity where suspect complained of shoulder injury); *Veney v. Ojeda*, 321 F. Supp. 2d 733, 743-44 (E.D. Va. 2004) (denying qualified immunity where incident resulted in plaintiff's hand swelling).

Considering the totality of the circumstances, where Peprah's hands remained in clear view, or indeed in the grasp of the officers, and Peprah complied with the officers' commands at

every turn, and demonstrated no intent to escape, hitting him in the back or pinning him to the ground with such force that he suffered a permanent back injury was clearly not proportional. *See, e.g.*, *Smith*, 781 F.3d at 97-98 (affirming denial of summary judgment on qualified immunity grounds where an officer "jamm[ed] his full weight into [a detainee's] back with his knee, and painfully twist[ed] her right arm behind her back"); ECF 52-8 at 3 (providing expert testimony that if Peprah's account is believed, the use of force would be "excessive and not objectively reasonable and not consistent with accepted standards of police policies, practices, and training"). When a detainee offers little to no resistance, a police officer uses excessive force if he throws the detainee down and forcefully pins him to the ground. *See Smith*, 781 F.3d at 97-98. In *Smith v. Ray*, the Fourth Circuit found this amount of force excessive where the detainee was not immediately submitting to the officer and failed to keep both her hands in view. *Id.* Although, admittedly, the plaintiff in *Smith* was a "smaller woman" and Peprah is a larger man, the officer in *Smith* believed the woman was trying to get away and fight back, while the officers here have uniformly testified that Peprah was compliant and did not resist. Although there may be factual distinctions between previous cases where the court found excessive force was used and this case, the Fourth Circuit has explained that where an "officer took a situation where there obviously was no need for the use of any significant force and yet took an unreasonably aggressive tack" the officer is not entitled to qualified immunity. *Id.* at 104. Therefore, no reasonable officer would believe the force allegedly used against Peprah was reasonable. The Defendants' motion for summary judgment for claims arising from alleged excessive use of force will be denied as to Lux.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF 47, is DENIED as to the claims in Count II alleging that the officers arrested Peprah without probable

cause and that PFC Lux used excessive force, and GRANTED as to the remaining claims.[4]  A

separate implementing Order follows.


Dated:  September 17, 2020                                    _____/s/_____

                                                             Stephanie A. Gallagher
                                                             United States District Judge

---

[4] The *Monell* claim relating to the allegations in Count III was bifurcated for discovery and trial.
ECF 24.